**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MARK E. PERDUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 10-443-SLR |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

---

G. Wesley D. Quinton of Duane Morris LLP, Wilmington, Delaware. Attorney for Plaintiff.

Heather Benderson of the Social Security Administration, Philadelphia, Pennsylvania. Attorney for Defendant.

---

**MEMORANDUM OPINION**

Dated: September 13 , 2011
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Mark E. Perdue ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security ("defendant"), denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-83. Plaintiff has moved the court to reverse the administrative decision and remand the case to the Commissioner with instructions to award benefits or, alternatively, for further proceedings. (D.I. 12) Defendant cross-motioned for the court to affirm his decision and enter judgment in his favor. (D.I. 16) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

## II. BACKGROUND

### A. Procedural History

Plaintiff filed an application for DIB and SSI on December 21, 2005 alleging disability since June 2, 2003 due to back and neck pain and mood disorder. (D.I. 9 at 39, 68, 71) Plaintiff was 42 years old on the onset date of his alleged disability. (*Id.* at 39) Defendant denied plaintiff's application on March 29, 2007, and upon reconsideration on January 15, 2008. (*Id.* at 41, 47) Plaintiff requested a hearing which occurred before an administrative law judge ("ALJ") on February 14, 2008. (*Id.* at 50) At the hearing, plaintiff, with the assistance of counsel, testified as to his condition. (*Id.* at 402-32) In addition, Christina Beatty-Cody, an impartial Vocational Expert ("VE"), was present at the hearing and also testified. (*Id.* at 432-36)

On April 17, 2009, the ALJ decided that plaintiff is not disabled within the meaning of the Social Security Act, specifically, that plaintiff can perform other work that exists in the national economy. (*Id.* at 30) The ALJ's decision became final on March 30, 2010 after the Appeals Council denied plaintiff's request to review the hearing decision. (*Id.* at 5) On May 27, 2010, plaintiff brought the current action for review of the final decision denying him DIB and SSI. (D.I. 1)

**B. Non-Medical History**

Plaintiff is currently 50 years old. (D.I. 9 at 408-09) He has a ninth grade education and is able to read, write, and perform simple math. (D.I. 9 at 408-09) Plaintiff's past employment reached the level of substantial gainful activity and, therefore, constitutes past relevant work. (*Id.* at 28) Plaintiff stopped working on June 2, 2003,[1] the onset date of his alleged disability. (*Id.* at 71)

**C. Medical History**

Plaintiff was under the care of a number of physicians. Contacts with his doctors, discussed below, are addressed in chronological order.

On June 1, 2003, plaintiff consulted with Jamal K. Gwathney, M.D. for pain in his neck, back, and left leg. (*Id.* at 132) An examination revealed tenderness in the cervical spine, left mid-trapezius spasm, and positive Spurling's test.[2] (*Id.*) Dr. Gwathney diagnosed plaintiff with cervical/thoracic strain with vertebral tenderness for which he prescribed Flexeril and Percocet, and recommended an MRI of the spine.

---

[1] In 2000, plaintiff fell from a roof striking the right side of his head and shoulder. (D.I. 9 at 111, 132) Plaintiff has no treatment records until June 1, 2003, when he complained of back and neck pain. (*Id.* at 132)

[2] Evaluation for cervical nerve root impingement; positive when maneuver elicits radicular arm pain. *http://www.drugs.com/dict/spurling-test.html*

(*Id.*) On November 20, 2003, Paul McCready, M.D. compared the imaging results to a November 2000 MRI and found minor degenerative changes[3] in the cervical spine and no evidence of fracture or subluxation in either the cervical and thoracic spines. (*Id.* at 135)

Plaintiff returned to Dr. Gwathney on January 9, 2004 complaining that his current pain medication prescribed by another physician was ineffective.[4] (*Id.* at 131) Although on examination Dr. Gwathney elicited pain response, he was concerned about possible drug-seeking behavior because plaintiff requested a refill of Xanax[5] he purportedly was prescribed for anxiety and stress, and he had previously sought pain medication during the initial consultation in June 2003. (*Id.*) Dr. Gwathney only prescribed Percocet through January 22, 2004, the date of the second MRI. (*Id.*) Xiang Sean Liu, M.D., who reviewed the MRI, noted the alignment of the cervical and thoracic spine, vertebral body heights, and marrow signals as "unremarkable," and a small disc protrusion and two small to moderate disc/osteophyte complexes in the cervical spine without cord compression. (*Id.* at 133-34) In the thoracic spine, the only abnormality Dr. Liu noted was an impression of a probable small hemangioma.[6] (*Id.* at 134) The following week, plaintiff reported Percocet relieved his neck pain. (*Id.* at 130) Dr. Gwathney diagnosed chronic pain, but did not prescribe any additional medication.

---

[3] Dr. McCready noted posterior spurring at C6-C7 "appears more prominent than on the previous study," and "minimal spurring at C4-C5." (D.I. 9 at 135)

[4] No records or the identity of this doctor were provided,. Plaintiff related a physician prescribed Darvocet, a pain reliever. (D.I. 9 at 131)

[5] Medication used to treat anxiety and panic attacks. *http://www.medicinenet.com/alprazolam/article.htm*

[6] Birth irregularity where a localized tissue mass grows rich small blood vessels. *http://www.medterms.com/script/main/art.asp?articlekey=3677*

(*Id.*) In February 2004, Dr. Gwathney's assessment remained unchanged, despite plaintiff complaining that physical therapy and home exercises provided only brief relief. (*Id.* at 128)

After his release from jail in May 2005,[7] plaintiff consulted with Jenny Lee Chen, M.D. on July 5, 2005, who noted discomfort and limited active range of neck motion. (*Id.* at 127) Dr. Chen diagnosed neck and upper back strain, prescribed Ultram,[8] prescribed physical therapy and referred plaintiff to a pain specialist. (*Id.*) On September 2, 2005, after just four sessions, plaintiff was discharged from physical therapy.[9] (*Id.* at 136) Plaintiff's "moderately inconsistent" treatments resulted in no progress. (*Id.* at 137)

Plaintiff initially consulted with specialist Arnold Glassman, D.O. on July 22, 2005. (*Id.* at 188) On examination, Dr. Glassman observed significant pain inhibiting cervical and lumbar range of motion, but also found no antalgic gait and normal cervical and lumbar lordosis. (*Id.* at 189) Dr. Glassman further noted plaintiff was "diffusely tender almost out of proportion to the amount of touch" and in light of no apparent organic basis, his impression was probable pain amplification. (*Id.*) Plaintiff was diagnosed with chronic cervicothoracic and lumbosacral spine pain with myofascial pain and somatic dysfunction and was instructed to complete his physical therapy. (*Id.*) Dr.

---

[7] Plaintiff was incarcerated for one year following his second DUI arrest. (D.I. 9 at 127)

[8] Anti-inflammatory medication used to treat moderate to moderately severe pain. *http://www.medicinenet.com/tramadol/article.htm*

[9] Plaintiff failed to attend physical therapy and cancelled several appointments. (D.I. 9 at 136)

Glassman refused to prescribe any narcotic analgesic medication before an updated EMG.[10] (*Id.*)

Plaintiff had an EMG of his lower left extremity on August 10, 2005. (*Id.* at 182, 186) The EMG was normal with no evidence of left lumbosacral radiculopathy, peripheral polyneuropathy, or entrapment neuropathy. (*Id.* at 187)

Plaintiff returned to Dr. Glassman on August 12, 2005, whose diagnosis remained the same. (*Id.* at 183) The evaluation of the cervical spine showed marked restricted range of motion, with no pain radiating into the upper extremities. (*Id.*) The lumbosacral spine examination showed limited extension, although plaintiff could bend forward and reach his knees before a marked increase in pain. (*Id.*) Other testing revealed plaintiff ambulated without evidence of weakness or fatigue and normal muscle strength of the upper and lower extremities. (*Id.*)

To rule out a herniated disc, Dr. Glassman scheduled an MRI of the lumbosacral spine. (*Id.*) On August 25, 2005, Jeffrey L. Hare, M.D., who read the MRI, reported a possible hemangioma L1 vertebral body and degenerative disease at the L5-S1 level, but that the spine, paraspinal region, disc and disc levels were "otherwise unremarkable," without herniation, stenosis or neural impingement. (*Id.* at 180)

Plaintiff returned to Dr. Glassman on September 30, 2005; both his symptoms and diagnosis were unchanged. (*Id.* at 175-76) Dr. Glassman referred plaintiff for a CT scan to be compared to the recent lumbosacral MRI. (*Id.*) On October 7, 2005, Vartan N. Igidbashian, D.O. reviewed the CT scan, finding multilevel mild degenerative

---

[10] EMG is an abbreviation for electromyogram, a test used to evaluate the electrical activity of muscles. *http://www.medicinenet.com/electromyogram/article.htm*

change, no disc herniations or significant stenosis, but also recommended further investigation to rule out other possible conditions. (*Id.* at 170)

Dr. Glassman referred plaintiff to Ginger Chiang, M.D. for possible cervical epidural steroid injections. (*Id.* at 172, 183) On October 4, 2005, Dr. Chiang diagnosed cervical disc herniations and cervical facet disease. (*Id.* at 173) On January 17, 2006, Dr. Chiang recorded that plaintiff had received two cervical epidural steroid injections with temporary symptom relief. (*Id.* at 160)

Upon a reevaluation by Dr. Glassman on November 23, 2005, plaintiff exhibited the same pain behavior as prior visits. (*Id.* at 167) Dr. Glassman's diagnosis of chronic cervicothoracic and lumbosacral spine pain with myofascial pain and somatic dysfunction was unchanged. (*Id.*) Plaintiff reported that the medication, Ultracet, was helpful. (*Id.*) Dr. Glassman ordered a bone scan to confirm the abnormality at L1 noted on the August 2005 MRI. (*Id.*)

On December 5, 2005, Dr. Hare reviewed the bone scan and found the L1 vertebral body to be "unremarkable." (*Id.* at 165) His impression was possible sternal and right sided rib fractures and degenerative changes. (*Id.*) Dr. Glassman was unable to confirm this impression during an office visit on December 21, 2005 because plaintiff did not complain of any sternal or rib cage pain, and percussion of his chest wall produced no pain. (*Id.* at 162-63) Dr. Glassman's impression remained the same, and he advised plaintiff to be consistent with the home exercise program and refilled prescriptions for Naproxen and Ultracet for pain relief. (*Id.* at 163)

During a reevaluation on January 20, 2006, Dr. Glassman reported no changes in symptoms or diagnosis, recommended physical therapy and continued the same medications (*Id.* at 156-57)

After his return on March 17, 2006, Dr. Glassman noted plaintiff ignored his advice by not attending physical therapy and his symptomology failed to improve since the initial consultation. (*Id.* at 154) He concluded plaintiff was stable and had a functional range of motion in the cervicothoracic spine, except at the extremes. (*Id.*) Although plaintiff exhibited tenderness in the cervicothoracic and lumbar spine with limited flexion and extension of his trunk, he tested normal for strength, reflexes, and sensation. (*Id.* at 154-55) Dr. Glassman specifically rejected surgery as a rehabilitative option, noting "although [plaintiff] has some discogenic etiology to his pain, I do not think he has done enough from a physical perspective in order to rehabilitate himself." (*Id.* at 155) Dr. Glassman recommended a home exercise program of aerobic and weight-lifting activities. (*Id.*)

Plaintiff returned for his final reevaluation with Dr. Glassman on May 26, 2006. (*Id.* at 150) He felt better on Darvocet and Soma,[11] two medications prescribed by Dr. Russo.[12] (*Id.*) Neither plaintiff's symptoms nor Dr. Glassman's impression were significantly changed. (*Id.*)

Plaintiff initiated treatment with Morris E. Antebi, M.D., a pain specialist, on August 18, 2006. (*Id.* at 211) Plaintiff explained he was coping poorly with pain in multiple areas of his spine and was taking Xanax and Zoloft for alleged depression and

[11] A muscle relaxant for short-term relief of painful muscle conditions. *http://www.medicinenet.com/carisoprodol/article.htm*

[12] Dr. Russo's records are not part of the certified transcript.

anxiety. (*Id.*) On examination, plaintiff had pain and tenderness in the posterior cervical and lumbar spine with limited range of motion, flexion, and extension, but could walk. (*Id.* at 211-12) Dr. Antebi diagnosed cervical, lumbar, and thoracic discogenic disease with cervical and lumbar radiculopathy, and recommended cervical epidural injections and, if unsuccessful, medical branch blocks. (*Id.* at 212)

Plaintiff had not begun the injection series when he returned to Dr. Antebi on September 12, 2006. (*Id.* at 209) On physical examination, similar pain symptoms with limited range of motion and decreased bilateral strength, flexion, and extension were noted. (*Id.*) Plaintiff's request for an increased dosage in pain medication was rejected until after completion of the scheduled injections, which began on September 18, 2006. (*Id.* at 208-09) At an office visit on December 5, 2006, Dr. Antebi noted that plaintiff was stable on the present pain medications and remained tender in his neck and lower back without any neurological deficit. (*Id.* at 323)

Throughout the duration of plaintiff's treatment with Dr. Antebi, his diagnosis of cervical and lumbar discogenic disease did not change. (*Id.* at 313-23) On February 20, 2007, plaintiff reported experiencing complete pain relief for four or five days following the second cervical injection administered on January 29, 2007, but the pain then returned. (*Id.* at 319-20) At that time, Dr. Antebi refused plaintiff's request for an increased dosage of Lortab.[13] (*Id.* at 319) On June 19, 2007, Dr. Antebi noted plaintiff was "basically stable" despite continued back and neck pain. (*Id.* at 316) Dr. Antebi administered a third cervical injection on August 3, 2007. (*Id.* at 314) Later that month,

---

[13] A combination of acetaminophen and hydrocodone used to treat moderate to severe pain. *http://www.drugs.com/lortab.html*

plaintiff reported 50% pain relief for one to two days following the injection. (*Id.* at 313) The medical branch block procedure was discussed with plaintiff, who again requested his medication be increased. (*Id.*) Plaintiff was also screened for drugs and tested positive for oxycodone, benzodiazepines, opiates, and marijuana. (*Id.*) Although plaintiff denied using Percocet, oxycodone, and marijuana, another drug screening was ordered. (*Id.*) Dr. Antebi threatened to discharge plaintiff if the results did not change. (*Id.*)

On June 30, 2006, plaintiff initiated treatment at Cape Counseling Services with complaints of anxiety, depression, and post-traumatic stress disorder (PTSD). (*Id.* at 273) During the intake evaluation, plaintiff described gradually becoming more depressed as a result of his arrests, imprisonment, drug use, marital issues, and untreated child abuse. (*Id.*) Plaintiff further reported previous treatment for marijuana and cocaine abuse, occasional present marijuana use, and continued participation in Alcoholic's Anonymous (AA). (*Id.* at 273-74) Impressions of plaintiff's mental condition included depressed mood, appropriate judgment and organized thoughts, and a 61 GAF score.[14] (*Id.* at 282) The treatment recommended was Low level care,[15] couples counseling and a psychology evaluation. (*Id.* at 285)

On July 15, 2006, plaintiff self-admitted to the emergency room of Cape Counseling Services to obtain medication. (*Id.* at 267-72) He was diagnosed with adjustment disorder and polysubstance dependence in early partial remission. (*Id.* at

[14] The Global Assessment of Functioning (GAF) scale is used in reporting overall functioning. A GAF score of 61-70 indicates some mild symptoms. Diagnostic and Statistical Manual of Mental Disorders 4th Ed. Text Revision ("DSM"), p. 32-34.

[15] Cape Counseling Services describes its levels of care as Low (1-12 visits per year), Moderate (13-48 visits per year), and High (49+ visits per year). (D.I. 9 at 285)

271) At that time, his GAF score was 55.[16] (*Id.*) Plaintiff failed to meet the criteria for inpatient hospitalization and was informed that his mental evaluation would be rescheduled if earlier appointments became available. (*Id.* at 271-72)

Karen Kaschak, RN, CNS, administered a psychiatric evaluation of plaintiff on July 20, 2006. (*Id.* at 263) Ms. Kaschak noted plaintiff was irritable, angry, cried at times, and expressed his desire to begin an anti-depressant. (*Id.*) The mental status exam revealed no psychotic symptoms. (*Id.* at 265) His GAF score was 55. (*Id.*) His diagnosis included cocaine, cannabis, and alcohol abuse, rule-out polysubstance dependancy, major depressive disorder, and rule-out bipolar disorder. (*Id.*) Ms. Kaschak prescribed Zoloft for depression, recommended outpatient therapy, and to abstain from all substances. (*Id.* at 266) Plaintiff saw Ms. Kaschak for a psychiatric update on September 7, 2006, and no changes in plaintiff's mental status or diagnoses were made. (*Id.* at 261)

On December 13, 2006, plaintiff was sent to the emergency department of Cape Counseling Services after he refused an evaluation following an attempted suicide by overdose on December 10, 2006. (*Id.* at 255) Plaintiff's suicide attempt was in response to his wife throwing him out of their home. (*Id.*) Plaintiff was reportedly agitated and uncooperative during the evaluation and was observed making non-specific threats to his wife over the phone if she did not help him. (*Id.* at 255, 258) It

[16] A GAF score of 51-60 denotes "[m]oderate symptoms (flat affect and circumstantial speech, occasional panic attacks) **or** moderate difficulty in social, occupational, or school functioning (few friends, conflicts with peers or co-workers). DSM, p. 32-34.

was also noted that treatment with Ms. Kaschak was inactive and no psychiatric medication was prescribed after he missed multiple appointments. (*Id.* at 258)

Plaintiff saw Ms. Kaschak for a psychiatric update on January 11, 2007 and reported feeling calmer on Lithium.[17] (*Id.* at 253) A mental status exam revealed plaintiff's mood was improved, his speech was clear, and he was goal-oriented. (*Id.*) Plaintiff was diagnosed with major depressive disorder, rule-out bipolar disorder, and rule-out polysubstance abuse. (*Id.*) Although Ms. Kaschak's diagnoses remained unchanged, plaintiff's mood and ability to cope with his symptoms were reported as improved on subsequent visits in February, March, and June 2007, and stable on Lithium. (*Id.* at 248-49, 251) During his last visit on August 30, 2007, he informed Ms. Kaschak of a recent arrest and he was estranged from his family. (*Id.* at 245) Plaintiff's mood at that time was recorded as "not good." (*Id.*)

At the request of Disability Determination Services (DDS), plaintiff saw David T. London, Ph.D. for a psychiatric evaluation on March 8, 2007. (*Id.* at 213-17) Plaintiff's mood was sad and his thought content reflected concerns for his family and himself; he did not appear manic or subject to panic attacks. (*Id.* at 215) Dr. London diagnosed mood disorder, dysthymic disorder, PTSD, anxiety disorder, with a history of alcohol, cannabis, and cocaine abuse. (*Id.*) He recommended continuing psychotherapy and psychotropic medication treatment. (*Id.*)

DDS scheduled a consultative exam with Ronald Bagner, M.D. on March 20, 2007. (*Id.* at 232) Dr. Bagner reported plaintiff ambulated with a slow cautious gait,

[17] Used to treat manic/depressive (bipolar) and depressive disorders. *http://www.medicinenet.com/lithium/article.htm*

had moderate difficulty getting on and off the examining table, was not uncomfortable in the seated position and could heel and toe walk with moderate difficulty. (*Id.* at 233) Plaintiff exhibited a limited range of motion in the cervical area due to pain, but a normal range of movement in the lower back. (*Id.*) Dr. Bagner's impression was cervical and lumbar radiculopathy. (*Id.*)

Plaintiff saw Lewis A. Lazarus, Ph.D., a clinical psychologist, for a mental status examination on behalf of DDS on November 20, 2007. (*Id.* at 286) Plaintiff appeared depressed, anxious, and tense. (*Id.* at 287) His social skills and thought processes were coherent and adequate, but he had a below average general fund of knowledge. (*Id.*) Dr. Lazarus estimated plaintiff was mentally functioning in the borderline range. (*Id.*)

Paul H. Steel, M.D. evaluated plaintiff at the request of DDS on December 28, 2007. (*Id.* at 289) Plaintiff had difficulty assuming the supine position on the examining table and had marked limitation of neck and back motion. (*Id.* at 291) Dr. Steel assessed chronic disc problems and chronic low back pain syndrome with radicular components. (*Id.* at 292)

On April 4, 2008, plaintiff began treatment with Domingo Singson, M.D. for complaints of difficulty breathing, hypertension, chest pain, and back problems. (*Id.* at 338) Dr. Singson reported plaintiff's back pain to be moderately severe and the medication as effective. (*Id.*) A musculoskeletal examination exhibited limited neck range of motion without pain or spasm. (*Id.*) Pain in the thoracic and lumbar paravertebral muscles and a positive leg raising test were noted. (*Id.*) Dr. Singson

described plaintiff's overall condition as stable. (*Id.*) Plaintiff was diagnosed with lumbago[18] and prescribed Percocet, Soma, Klonopin,[19] Lithium, and Cymbalta.[20] (*Id.*)

On May 5, 2008, plaintiff returned to Dr. Singson for follow-up and reported the same complaints. (*Id.* at 335) Dr. Singson's examination revealed no changes in symptoms or the severity of plaintiff's condition. (*Id.* at 336-37) Dr. Singson diagnosed plaintiff with cardiomegaly,[21] lumbago, and unspecified insomnia. (*Id.* at 337)

At plaintiff's next visit on June 5, 2008, Dr. Singson noted an additional complaint of chronic anxiety. (*Id.* at 332) Dr. Singson diagnosed plaintiff with cardiomegaly, lumbago, and unspecified moderate anxiety. (*Id.* at 334) No changes were reported on office visits dated July 3, 2008 and July 22, 2008. (*Id.* at 326-31)

**D. Medical Opinions Regarding Residual Functional Capacity**

Dr. Joshua Weisbrod, a DDS medical consultant, issued his case analysis and a Physical Residual Functional Capacity Assessment ("Physical RFC") on March 29, 2007. (*Id.* at 237-44) Dr. Weisbrod opined plaintiff could lift or carry 10 pounds frequently,[22] stand and/or walk at least 2 hours and sit 6 hours in an 8-hour workday, and could push and pull on an unlimited basis. (*Id.* at 238) He further noted plaintiff

[18] Lumbago means localized pain in the lumbar (lower) region of the back. *http://www.medicinenet.com/low_back_pain/page2.htm*

[19] Medication used for short-term relief of anxiety symptoms. *http://www.medicinenet.com/clonazepam/article.htm*

[20] Medication used to treat depression and generalized anxiety disorder. *http://www.medicinenet.com/duloxetine/article.htm*

[21] Cardiomegaly is an abnormal enlargement of the heart. *http://www.medterms.com/script/main/art.asp?articlekey=106988*

[22] Frequently being defined as "from 1/3 to 2/3 of an eight-hour workday." (D.I. 9 at 237)

could occasionally[23] stoop, kneel, crouch, crawl, and climb ramps or stairs, but never ladders, ropes or scaffolds. (*Id.* at 239) No manipulative, visual, or communicative limitations were found. (*Id.* at 240-41) Dr. Weisbrod's report advised plaintiff should avoid concentrated exposure to extreme cold, heat, wetness, humidity, and hazards. (*Id.* at 241) He concluded the severity of the symptoms and their alleged effect on function were partially proportionate with the medical and non-medical evidence and were attributable to cervical and lumbar radiculopathy. (*Id.* at 242)

DDS medical consultant, Dr. Jane Curran, reviewed plaintiff's file and issued a Mental RFC Assessment on March 14, 2007. (*Id.* at 295-97) She concluded plaintiff's ability do the following were moderately limited: understand, remember, and carry out detailed instructions; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (*Id.* at 295-96) Dr. Curran opined that the available evidence indicated plaintiff could meet the basic mental demands of unskilled work. (*Id.* at 297)

DDS medical consultant, Dr. Raymond Briski, reviewed plaintiff's file and issued a second Physical RFC Assessment on January 9, 2008. (*Id.* at 299-306) Dr. Briski reported the same exertional, postural, manipulative, visual, and communicative limitations as Dr. Weisbrod, but reported no environmental limitations. (*Id.* at 300-03) Further, he reported the same diagnosis of cervical and lumbar disc radiculopathy. (*Id.* at 300) Dr. Briski added that, while some of plaintiff's alleged functional limitations are

---

[23] Occasionally being defined as "from very little up to 1/3 of an eight-hour workday." (D.I. 9 at 237)

reasonably expected, others, such as his alleged inability to walk more than 100 feet at a time before needing to rest or sit for 5-10 minutes, are not supported by medical and non-medical evidence. (*Id.* at 304)

Plaintiff's primary care physician, Dr. Domingo Singson, completed a Multiple Impairment Questionnaire on July 22, 2008. (*Id.* at 354-61) He reported that during an eight-hour workday: plaintiff could stand/walk a total of one hour; sit a total of one hour or thirty minutes without interruption; and would need unscheduled rest breaks four times an hour. (*Id.* at 356, 359) Dr. Singson further recorded plaintiff could occasionally lift or carry a maximum of ten pounds; was moderately limited in grasping, turning, or twisting objects; and markedly limited using his fingers/hands for fine manipulations and when reaching. (*Id.* at 357-58) Dr. Singson additionally opined: plaintiff could not tolerate a "low stress" work environment; his pain or other symptoms would frequently interfere with his attention and concentration; his absenteeism would occur at least three times per month; and pushing, pulling, kneeling, bending, stooping, noise, fumes, gases, extreme temperatures, humidity, and heights should be avoided. (*Id.* at 358-60)

**E. Hearing Before ALJ**

**1. Plaintiff's testimony**

Plaintiff testified he has a ninth grade education and is able to read, write, and perform simple math. (*Id.* at 408-09) He had previously worked as a roofer, but stopped after an alleged fall in June 2003. (*Id.* at 409-10) Shortly thereafter, plaintiff

worked as a foreman, but was purportedly laid off and has not worked since. (*Id.* at 411)

Plaintiff testified his mental impairments bother him the most. (*Id.* at 413) He suffers from depression, stress, anxiety, and bipolar disorder which negatively impact his relationship with his wife and daughter. (*Id.* at 413-14) He stated he experiences anxiety attacks weekly, lasting from ten minutes to an hour, during which he has difficulty breathing. (*Id.* at 418)

His only mental health treatment are the following medications prescribed by his primary physician: Cymbalta for depression, Lithium for bipolar disorder, and Klonopin for the anxiety and stress. (*Id.* at 414) He testified his mental condition is not improving. (*Id.* at 419)

Plaintiff also testified he suffers daily from lower back pain which radiates to his legs while walking. (*Id.* at 421-22) His last treatment for his back was physical therapy in 2005, because his insurer would not provide coverage. (*Id.* at 421) He currently takes Percocet and Soma for his pain. (*Id.* at 420-21) In addition, plaintiff testified that daily neck pain severely limits mobility in all directions, and his neck and back problems have remained unchanged. (*Id.* at 423-24)

Plaintiff claimed he can ambulate a block before needing to rest, is able to climb stairs and stand for a half hour. (*Id.* at 425-26) He stated he could not sit in a straight-backed chair and could only lift objects weighing up to ten pounds. (*Id.* at 426) He can also dress himself, brush his teeth, and shower, but needs his wife to dry his back. (*Id.* at 428) His wife does not allow him to do household chores, but plaintiff can cook and

accompanies his wife and daughter to the grocery store. (*Id.* at 428-29) His daily activities include watching TV, listening to the radio, and spending time with his daughter. (*Id.* at 429)

**2. Vocational expert's testimony**

After the presentation of plaintiff's evidence, the ALJ asked the VE the following hypothetical: whether a 42 year old man, with a ninth-grade education and a work history as a roofer, could perform simple, unskilled work at a light level of exertion that did not involve climbing a ladder, rope, or scaffold or concentrated exposure to temperature extremes, hazards, wetness, and humidity. (*Id.* at 433) In response, the VE offered three possible occupations: mail clerk, photocopy machine operator, and collator. (*Id.* at 434) When asked to consider such a person further limited to a sedentary level of exertion, the VE offered two other occupations: surveillance system monitor and type-copy examiner. (*Id.*) She stated the impact of being unable to keep his neck in a constant position would depend on the particular work environment.[24] (*Id.* at 435) The VE noted the additional limitations of at least three work absences per month and four, 5-10 minute-unscheduled breaks an hour would preclude any employment. (*Id.* at 436)

**III. STANDARD OF REVIEW**

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing

[24] As an example, the VE suggested that adjusting the height of a computer monitor might be one way plaintiff could avoid keeping his neck in a constant position. (D.I. 9 at 435)

court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See Id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See Id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *See Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court has also embraced this standard for deciding summary judgment pursuant to Federal Rule of Civil Procedure 56. Under that standard, the threshold inquiry is whether there is the need for a trial, whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under

§ 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., that offered by treating physicians), or if it really constitutes not evidence but mere conclusion." *See Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schwiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

## IV. DISCUSSION

### A. Regulatory Framework

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers, in the second step, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment contained in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1991), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed

impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work. If the claimant cannot perform his past work, then step five is to determine whether there is other work in the national economy which the claimant can perform. *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds a claimant disabled or not disabled at any point in the sequence, the review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence which supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1257(e)(2) & 404.1527(e)(3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. § 404.1527(c)(2).

**B. The ALJ's Decision**

The ALJ considered the medical evidence of record and testimony during the hearing, and concluded plaintiff retains the capacity for work and is not disabled as defined by the Social Security Act. The ALJ made the following enumerated findings.

> 1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2007.

> 2. The claimant has not engaged in substantial gainful activity since June 2, 2003, the alleged onset date (20 C.F.R. §§ 404.1571, *et seq.*, and 416.971, *et seq.*).
>
> 3. The claimant has the following severe impairments: cervical and lumbar degenerative disc disease and radiculopathy, and depression (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Additionally, the ALJ determined plaintiff's asthma and prior substance abuse were not severe impairments. (*Id.* at 18-19) Minimal clinical evidence supported "any finding of significant vocational impact related to [plaintiff's alleged asthma] condition," and a recent spirometry was normal. (*Id.* at 18) The ALJ also noted that, although the record indicated a prior history of substance abuse and a positive illegal drug test in August 2007, plaintiff "testified that he has been drug free since February 2006, last used alcohol four years ago," and "there is no evidence that the claimant is currently using alcohol or drugs after August 2007." (*Id.* at 19)

> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525, 404.1526, 416.925 and 416.926).

The ALJ reviewed sections 1.04, 12.09, 12.04, 12.06, and 12.08 of 20 C.F.R. part 404, Appendix 1 related to the musculoskeletal system and mental disorders. (*Id.* at 19-20) She concluded that both plaintiff's spinal condition and mental impairment fail to meet the precise criteria of the listings. (*Id.* at 20, 23)

> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), but limited to simple, unskilled work, with occasional postural activities but no climbing ladders, ropes, or scaffolding, avoiding concentrated exposure to temperature extremes, hazards, wetness and humidity, and work not at a production pace meaning not paid by the piece or working at an assembly

> line, occasional contact with the general public, work that is essentially isolated with occasional supervision, and low stress work, defined as only occasional changes in the work setting.

In this regard, the ALJ considered all symptoms and the extent to which they were reasonably consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929 and SSRs 96-4p and 96-7p. (*Id.* at 24) The ALJ also considered opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. (*Id.*) This involved a two-step process in which the ALJ first determined whether there was an underlying "medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms," and then "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities." (*Id.*)

Although the ALJ concluded claimant's "impairments could reasonably be expected to result in some of the symptoms as alleged," she found the medical record failed to offer any objective medical evidence to support the severity plaintiff asserted. (*Id.* at 24-28)

> 6. The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565 and 416.965).

The ALJ noted that the "claimant has past relevant work as a roofer," and the "vocational expert assessed the claimant's job as heavy exertional, unskilled work."[25]

---

[25] Residual functional capacity and past relevant work are classified as either sedentary, light, medium, heavy or very heavy. *Burnett v. Comm'r of SSA*, 220 F.3d 112, 120 (3d Cir. 2000) (citing *Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir. 1994)); 20 C.F.R. § 404.1567.

(*Id.* at 28) In comparing his residual functional capacity with the physical demands of his past work, the ALJ found plaintiff unable to perform such employment. (*Id.* at 28-29)

> 7. The claimant was born on April 24, 1961 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).
>
> 8. The claimant has a limited education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).
>
> 9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 C.F.R. §§ 404.1568 and 416.968).
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from June 2, 2003 through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

**C. Analysis**

Plaintiff argues that the ALJ's determination was not based upon substantial evidence because it: (1) failed to follow the treating physician rule; (2) improperly evaluated plaintiff's credibility; and (3) relied upon flawed VE testimony. (D.I. 13) The court addresses these arguments in turn.

**1. Treating physician rule**

Plaintiff maintains Dr. Singson's opinion should have been given controlling weight or, in the alternative, significant weight. (*Id.* at 23) Plaintiff cites to 20 C.F.R. § 404.1527(d)(2) for the factors an ALJ considers to decide the weight assigned to a

treating physician's opinion if it is not afforded controlling weight. (*Id.* at 21) Although a treating physician's opinion is entitled to "great weight," a doctor's opinion on disability is not dispositive. Further, the ALJ may discount a treating physician's opinions if they are not supported by the medical evidence. *Bates v. Astrue*, No. 07-074-JJF, 2008 U.S. Dist. LEXIS 30817, at *34 (D. Del. Apr. 11, 2008) (citing *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001) & *Mason v. Shalala*, 944 F.2d 1058, 1067 (3d Cir. 1993)).

The ALJ extensively analyzed the treating physician's findings and conclusions. (D.I. 9 at 27-28) After thoroughly reviewing the medical evidence, the ALJ found the impairment questionnaire completed by Dr. Singson was not supported by "objective testing" and "inconsistent with other substantial evidence in the case record." (*Id.* at 27) She further determined that Dr. Singson's treatment records note "mild to moderate symptoms, reduced range of motion, but no suggestion during that time that the claimant could not work." (*Id.*) Therefore, the ALJ concluded there was "good cause for not giving substantial weight to [the] treating physician's opinion." (*Id.* at 28)

The court finds the ALJ properly weighed Dr. Singson's findings in relation to the medical evidence, and provided sufficient reasons for her determination. The ALJ identified that, although Dr. Singson had been seeing plaintiff since March 2008 on a monthly basis, he listed July 2008 as the earliest plaintiff's limitations would apply, the date he was completing the questionnaire. (*Id.* at 27) The ALJ noted Dr. Singson's treatment records show no report of a significant change to warrant conclusions of disabling limitations in July 2008. (*Id.*) The ALJ further observed that Dr. Singson did not refer to plaintiff's most recent objective testing in March 2008, where cervical

imaging showed "only small anterior/superior endplate osteophytes at C5" and normal thoracic and lumbar spinal imaging. (*Id.*) Further, the ALJ correctly stated she "need not accept the opinion of any physician, including a Social Security disability claimant's treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings. (*Id.* at 28)

Although a "treating [physician's] opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance," a doctor's opinion "about issues reserved to the Commissioner must never be ignored." SSR 96-5P. Any "decision must explain the consideration given" to the treating physician's analysis. (*Id.*) Here, the ALJ properly weighed Dr. Singson's opinion and provided the bases for her determination as required under 20 C.F.R. § 404.1527. (D.I. 9 at 27-28)

**2. Plaintiff's credibility**

Plaintiff contends the ALJ's credibility determination was insufficient, because she selectively focused on portions of plaintiff's statements that did not support his allegations, and because she erroneously noted that treatment records failed to support plaintiff's allegations of panic attacks. (D.I. 13 at 25-26) He also states it was improper for the ALJ to discredit his complaints on the basis of only receiving conservative treatment. (*Id.* at 26) When evaluating a claimant's symptoms, the ALJ must first determine whether there is "a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a). The ALJ must then evaluate the intensity and persistence of the pain, in light of all the evidence, and the extent to which the symptoms affect the claimant's ability to be

employed. *Id.*; *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). "Allegations of pain and other subjective symptoms must be supported by objective medical evidence." *Hartranft*, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529).

In the present matter, the ALJ provided an extensive review of plaintiff's symptoms and concluded "[plaintiff's] impairments could reasonably be expected to produce some of the symptoms as alleged," but expressed her reservations as to "whether the claimant's assertions concerning his impairments, and their impact on his condition, can be considered fully credible." (D.I. 9 at 28) Contrary to plaintiff's assertion, the ALJ was not wrong to reference his March 2006 filing in which he reported able to care for his children and shop for food and clothing, because in December 2007, plaintiff also told Dr. Lazarus that he could cook, prepare meals, and do basic shopping. (*Id.* at 287-88) In addition, other evidence in the record indicated plaintiff was more functional than he alleged. In November 2005, he told Dr. Glassman that he strained his neck and back when "he tried to help a guy out to make a little extra money." (*Id.* at 162) Also, in August 2007, plaintiff reported he was recently arrested for simple assault. (*Id.* at 245) Moreover, the ALJ correctly noted the record did not substantiate plaintiff's complaints of panic attacks. The only reference to this complaint in the record is a "review of systems" list recorded at his initial consultation with Dr. Chiang in connection with an epidural steroid injection evaluation. (*Id.* at 172-73) The list appears to refer to self-reported symptoms, and simply states "back pain and neck pain, headache, tingling, depression, anxiety, and panic attacks," prior to a physical examination. (*Id.*)

Furthermore, the ALJ did not err when she noted plaintiff's treatment was conservative, because she did not discredit plaintiff's allegations exclusively on that basis. *Jopson v. Astrue*, 517 F. Supp.2d 689, 706 (D. Del. 2007) (citing *Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000)).

**3. Adequacy of the VE's testimony**

Plaintiff also attacks the VE's testimony on the basis that the RFC assessment presented in the hypothetical question was inaccurate, because it did not include the limitations described in the questionnaire completed by Dr. Singson. (D.I. 13 at 27) "'[T]he vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the [hypothetical] question accurately portrays the claimant's individual physical and mental impairments.'" *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)). Only those impairments and limitations "medically established" by the record need to be included in the hypothetical. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). If, however, the hypothetical does not properly phrase the claimant's impairments and limitations, the VE's testimony cannot be considered substantial evidence. *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004).

The ALJ is responsible for assessing a claimant's RFC, and what a claimant is able to do despite his limitations, based on a consideration of all relevant evidence. 20 C.F.R. §§ 404.1545(a), .1546(c); 416.945(a), .946(c). A claimant's RFC formulation is expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). No

special significance is due to any medical source with respect to plaintiff's RFC capacity. 20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3). Because the ALJ properly considered Dr. Singson's opinion, the court finds the hypothetical sufficiently described all of plaintiff's medically determinable impairments, and the VE's testimony is substantial evidence of plaintiff's ability to work.

**V. CONCLUSION**

In view of the foregoing, substantial evidence supports the ALJ's determination that plaintiff is not disabled and is capable of doing light work. Plaintiff's motion for summary judgment (D.I. 12), therefore, is denied, and defendant's motion for summary judgment (D.I. 16) is granted. An appropriate order shall follow.